## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

— — — — — — — — — — — — — — — — — — — — — — — — — — X

OUTPOST24 AB,

                  **Plaintiff,**

   v.

LAUREL HEALTH CARE COMPANY
                  **Defendant.**

Civ. 1:21-CV-10449-ADB

— — — — — — — — — — — — — — — — — — — — — — — — — — X

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT LAUREL HEALTH CARE COMPANY'S
## MOTION FOR SUMMARY JUDGMENT

In accordance with the provisions of L.R., D. Mass. 7.1(b)(1), Defendant Laurel Health Care Company ("Laurel") files this Memorandum of Law in Support of Motion for Summary Judgment.

## I.     PRELIMINARY STATEMENT

Laurel is entitled to summary judgment on all four counts of the Complaint purporting to allege breach of contract (Count I), breach of covenant of good faith and fair dealing (Count II), deceit (Count III), and unfair business practices (Count IV). Count I should be dismissed because there can be no genuine dispute with respect to the material fact that Laurel terminated the contract for cause due to the material functional defects it experienced with the subscription service and devices and is, therefore, not responsible for paying the third year of the subscription. Counts II, III and IV should be dismissed because there can be no genuine dispute that (a) Laurel's nonpayment of the third year of the subscription was in good faith because prior to the renewal it properly terminated the contract for cause, and (b) Laurel did not make any misrepresentations to Plaintiff.

## II.   <u>STATEMENT OF MATERIAL FACTS</u>

On June 15, 2017, Laurel entered into an agreement with Rapid Focus Security, Inc. d/b/a Pwnie Express ("Pwnie") for the Pulse Platform Professional Edition ("PPPE"), a cyber security software service ("Pwnie Agreement").  Affidavit of Kelly Foster ("Foster Affidavit"), ¶ 6; Ex. A. The Pwnie Agreement refers to a term of thirty-six months, but states that the "annual PPPE Subscription fee . . . is payable annually on each Renewal Anniversary," the first of which was October 7, 2018, one year after the effective date of the Pwnie Agreement, and the second of which was October 7, 2019.  *Id.*  The Pwnie Agreement further provided for the delivery and use of forty-one sensors.  *Id.*  The sensors were placed in each of Laurel's facilities, and were supposed to scan Laurel's wireless network for security threats.  Affidavit of Nicholas Ries ("Ries Affidavit"), ¶ 7. Pwnie represented to Laurel that Laurel owned the sensors.[1]  Foster Affidavit, ¶ 7; *see* Ex. J, Deposition Transcript of Kelly Foster ("Foster Dep."), 51:18–52:6.

On the bottom of the second page of the Pwnie Agreement, there is a hyperlink purporting to be to the then current Pwnie Express SaaS Terms and Conditions ("Terms and Conditions"). Ex. A.   The Pwnie Agreement states that these Terms and Conditions are incorporated by reference.  *Id.*  At no point prior to signing the Pwnie Agreement did Laurel see or review the Terms and Conditions, nor did Pwnie ever send Laurel the Terms and Conditions separate from the hyperlink in the Pwnie Agreement.  Foster Affidavit, ¶ 8; Ex. K, Foster Dep., 59:12–20.  The first time Laurel saw the Terms and Conditions was on May 29, 2020, almost three years after the initial agreement was entered into, when Mette Brønager ("Brønager"), General Counsel for Plaintiff, emailed a copy to Kelly Foster ("Foster"), Laurel's Director of Information Technology. Foster Affidavit, ¶ 8; Ex. B; Ex. K, Foster Dep., 20:7–15.  At the time Brønager sent Foster the

---

[1] This representation is consistent with the agreement Pwnie has with Laurel's sister company, Ciena Healthcare, which recommended the Pwnie product to Laurel.  Ex. C; Ex. J, Foster Dep., 10:19–11:4, 71:12–14.

Terms and Conditions, the hyperlink was no longer active.  Ex. K, Foster Dep., 59:12–20, 61:21–62:13.

Section 2.1 of the Terms and Conditions referenced in the Pwnie Agreement provides: "Either party may terminate this Agreement upon thirty (30) days prior written notice in the event of a material breach by the other party of any term and condition of this Agreement and failure to cure such breach."  Ex. D.  On July 9, 2019, Laurel notified Pwnie by email of its intent to terminate the Pwnie Agreement more than thirty days prior to the renewal anniversary for the third year of the subscription—October 7, 2019—due to the material functional defects of the Pwnie service and sensors.  Ex. E.  Laurel requested and awaited further instruction from Pwnie as to whether Laurel needed to do anything else to wind down the contract.  Foster Affidavit, ¶ 11.  At no time after Laurel sent the July 9, 2019 termination notice to Pwnie did Pwnie ever contest the termination of the Pwnie Agreement or send Laurel an invoice for the third year of the subscription.  Foster Affidavit, ¶ 11; Ex. K, Foster Dep. 65:5–15.  Following the July 9, 2019 termination notice, Laurel believed its notice was effective and understood Pwnie's silence to be its acquiescence and acceptance of the termination.  Ex. B; Ex. K, Foster Dep., 94:9–96:13.

On or about August 11, 2019, Plaintiff acquired certain assets of Pwnie including the Pwnie Agreement.  Ex. M, Deposition of Plaintiff ("Plaintiff Dep."), 24:12–17.  Laurel became aware of this on October 2, 2019, when it received an email from Pwnie announcing the acquisition.  Foster Affidavit, ¶ 13; Ex. H.  On December 4, 2019, Ellinor Klingvall, Plaintiff's Order Manager & Legal Assistant, emailed Nicholas Ries ("Ries"), Laurel's Information Security Administrator, informing him that Laurel's payment for the third year of the subscription was past due and attaching an invoice dated September 27, 2019.  Ries Affidavit, ¶ 20; Ex. F; Ex. G.  This was the

first time Laurel received an invoice for the third year of the subscription.[2]  Foster Affidavit, ¶ 14; Ries Affidavit, ¶ 20.

Laurel did not pay the subscription fee for the third year because it properly terminated the Pwnie Agreement due to Pwnie's material breach of its performance obligations and Pwnie's failure to cure such breach more than thirty days prior to the third renewal anniversary in accordance with the Pwnie Agreement.  Ex. D; Ex. E.  Laurel experienced material functional defects with the Pwnie service and sensors beginning in September 2017 when Laurel started using the service and persisting throughout the approximately one year that Laurel used the service.  Ries Affidavit, ¶ 17; Ex. K, Foster Dep., 68:20–69:4, 69:17–22.  Laurel stopped using the service by late 2018—prior to the July 9, 2019 termination—due to the consistent recurring issues it experienced and Pwnie's failure to resolve the issues.  Ries Affidavit, ¶ 19; Ex. K, Foster Dep., 69:3–4.

Some of the defects Laurel experienced with the Pwnie service and sensors included: (a) when Pwnie initially sent the sensors to Laurel in 2017, numerous sensors were misconfigured and Laurel had to send approximately ten to twenty sensors back to Pwnie to be reconfigured; (b) the sensors were dropping off the network; (c) the sensors were unresponsive; (d) the system was overburdened and unstable due to the processes overloading the system; (e) Pwnie marketed the service as a vulnerability scanning tool, but the service had limited vulnerability scanning capabilities and the vulnerability scanning was causing the system to crash; (f) the data provided by the sensors was inconsistent and inaccurate; (f) the sensors delivered false positive alerts; and (g) the software connection would fail and kick the user out of the dashboard so it could not access

---

[2] Plaintiff alleges in its Complaint that on September 27, 2019, Laurel was invoice $90,191.80 for the third year of the subscription, however, Laurel did not receive the September 27, 2019 invoice until December 3, 2019–five months after Laurel notified Pwnie of its desire to terminate the Pwnie Agreement due to material functional defects with the Pwnie service and sensors. *See* Complaint, ¶ 18; Foster Affidavit, ¶ 14; Ries Affidavit, ¶ 20, Ex. E.

and monitor the data.  Ries Affidavit, ¶¶ 10–16; Ex. L, Ries Dep., 60:17–66:8; Ex. K, Foster Dep., 69:23–71:2.  These issues were recurring and Pwnie, after having been notified by Defendant of the issues on numerous occasions, was unable to fix them.  Ries Affidavit, ¶ 18; Ex. K, Foster Dep., 69:17–22; 110:8–111:2.  On July 9, 2019, when Foster informed Pwnie of the reason for Laurel's desire to terminate the Pwnie Agreement, neither Pwnie nor Plaintiff tried to resolve the issues.  Foster Affidavit, ¶¶ 12, 15; Ex. K, Foster Dep., 96:5–13.  In fact, Foster never heard from Pwnie again.  Ex. J, Foster Dep., 65:5–10.  Because of Pwnie's failure to cure the material functional defects Laurel was experiencing with the Pwnie service and sensors and Pwnie's failure to invoice Laurel for the third year of the subscription, Laurel, correctly and in good faith, considered the Pwnie Agreement to be terminated.  *See* Ex. B; Ex. K, Foster Dep., 94:9–96:13.

## III.   LAW AND ARGUMENT

### A.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (internal quotation marks omitted).

"To succeed in showing that there is no genuine dispute of material fact, the moving party must . . . affirmatively produce evidence that negates an essential element of the non-moving party's claim, or . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial."  *Ocasio-Hernández v. Fortufio-Burset*, 777 F.3d 1, 4–5 (1st Cir. 2015) (internal quotation marks omitted).  "To defeat a properly supported motion for summary

judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." *ATC Realty, LLC v. Town of Kingston, N.H.*, 303 F.3d 91, 94 (1st Cir. 2002) (internal quotation marks omitted).

"[M]otions for summary judgment must be decided on the record as it stands, not on a litigant's visions of what the facts might some day reveal." *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 253 (1st Cir. 1996) (internal quotation marks omitted). "Thus, speculation and surmise, even when coupled with effervescent optimism that something definite will materialize further down the line, are impuissant in the face of a properly documented summary judgment motion." *Id.*

**B.** **Laurel Is Entitled To Summary Judgment On Count I Because It Terminated The Pwnie Agreement And Is, Therefore, Not Responsible For Paying For The Third Year Of The Subscription.**

"Under Massachusetts law, a breach of contract claim requires the plaintiff to show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." *Bose Corp. v. Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013). It is common sense that a party to a contract cannot breach a contract that has been terminated. However, to the extent that Plaintiff may argue that Laurel did not properly terminate the contract, "[a] party to a contract generally is relieved of [its] obligations under that contract . . . when the other party has committed a material breach, that is, a breach of an essential and inducing feature of the contract . . . ." *Dalrymple v. Winthrop*, 97 Mass. App. Ct. 547, 556 (2020) (internal quotation marks omitted).

Laurel is entitled to summary judgment on Count I purporting to assert a claim for breach of contract because there is no genuine dispute as to the material fact that Laurel properly terminated the Pwnie Agreement prior to the third renewal anniversary due to material functional

defects and Pwnie's failure to cure such defects as allowable pursuant to the Pwnie Agreement. Ex. D; Ex. E. Because Laurel properly terminated the Pwnie Agreement, Laurel did not breach it by not paying the subscription fee for the third year. Assuming *arguendo* this Court finds that Laurel did not properly terminate the Pwnie Agreement, Laurel was nevertheless relieved of its obligation to pay for the third year of the subscription because Pwnie materially breached the Pwnie Agreement. *Dalrymple*, 97 Mass. App. Ct. at 556.

On July 9, 2019, Kurt Lee ("Lee"), Pwnie's Vice President of Sales, emailed Foster inquiring whether Laurel would serve as a reference account for Pwnie as it was working with another company that was interested in partnership with Pwnie. Ex. E. In response to Lee's email, Foster declined to serve as a reference for Pwnie because Laurel found the Pwnie product "of little use, not very accurate, buggy, the devices temperamental and certainly not worth $100K per year." *Id.* Lee informed Foster that he would make sure Foster's complaints were brought up in Pwnie's next "exec staff meeting" and stated: "If there is anything specific we can address in the near term would you please let me know." *Id.* Foster replied: "Obviously, *we will not be renewing our contract* (September?). So, if any type of notice is required, please consider this it and *do not bill us. Is there anything else Laurel needs to do to wind-down the contract?* Thanks." *Id.* (emphasis added). Laurel communicated in writing its desire to terminate the Pwnie Agreement on July 19, 2019, eighty days prior to the third renewal anniversary–October 7, 2019–in compliance with the notice requirement in the termination provision of the Terms and Conditions. Ex. E; *see* Ex. A.

After Foster notified Lee of Laurel's termination of the Pwnie Agreement, Pwnie did not respond; it did not address Laurel's complaints as to the performance of the product, it did not contest Laurel's termination of the agreement, and importantly, it did not invoice Laurel for the third year of the subscription. Ex. K, Foster Dep. 65:5–15, 94:9–96:13; Ex. B. Foster specifically

asked if there was anything else Laurel needed to do to wind-down the contract, to which Pwnie provided no response. *Id.* Laurel understood Pwnie's silence to be its acceptance and acquiescence of Laurel's termination of the Pwnie Agreement. *Id.* Especially as the Pwnie Agreement does not prescribe a method for acceptance of a termination notice. *See* Ex. A; Ex. D. As the record stands after the conclusion of discovery, there is no evidence that Pwnie ever responded to Foster's request to terminate or ever sent the invoice for the third year of the subscription. As such, Laurel was not obligated to pay for the third year of the subscription.

To the extent Plaintiff may argue that Foster's July 9, 2019 email to Lee was not an effective notice of termination because he did not specifically use the term "terminate," it is clear from Foster's email that he was expressing Laurel's desire to terminate the contract for cause and it was not necessary for Foster to specifically use the term "terminate." *See* Ex. E. The Pwnie Agreement states that the subscription fee was payable annually on each "**Renewal Anniversary**." Ex. A. In Foster's email to Lee, he stated Laurel would not be **renewing** its contract and stated: "So, if any type of notice is required, please consider this it and do not bill us. Is there anything else Laurel needs to do to **wind-down the contract**?" Ex. E. The Pwnie Agreement did not require, nor is there any law requiring, Foster to have specifically used the term "terminate" in order for his July 9, 2019 email to be an effective notice of Laurel's intent to terminate the Pwnie Agreement. Ex. A; Ex. D. Additionally, on May 29, 2020, Foster emailed Brønager stating: "Please be advised that Laurel Health Care Company cancelled the Pulse Platform Professional Edition service with Pwnie Express on 7/9/19." Ex. B. Foster's intention when he sent the July 9, 2019 email was to terminate the Pwnie Agreement prior to the third year of the subscription. Ex. K, Foster Dep., 90:13–91:17.

Further, even if Laurel did not properly terminate the Pwnie Agreement, Laurel was nevertheless relieved of its obligation to pay for the third year of the subscription because, as detailed in the subsequent section, Pwnie materially breached the Pwnie Agreement.  *See Dalrymple*, 97 Mass. App. Ct. at 556.

     **i.**     **Laurel Had Cause To Terminate The Pwnie Agreement Because Pwnie <u>Materially Breached the Agreement and Failed to Cure Such Breach</u>.**

Laurel properly terminated the Pwnie Agreement in accordance with Section 2.2 of the Terms and Conditions,[3] which provides: "Either party may terminate this Agreement upon thirty (30) days prior written notice in the event of a material breach by the other party of any term and condition of this Agreement and a failure to cure such breach."  Ex. D.  The Terms and Conditions do not include a definition of the term "material breach."  *See id.*  Under Massachusetts law, "a material breach of contract occurs when the breach concerns an essential and inducing feature of the contract."  *G4S Tech. LLC v. Massachusetts Tech. Park Corp.*, 479 Mass. 721, 733–34 (2018) (internal quotation marks omitted).  "Essential and inducing features of a contract are provisions that are so serious and so intimately connected with the substance of the contract[ ] that a failure to uphold the provision would justify the other party walking away from the contract and no longer being bound by it."  *Id.* (internal quotation marks omitted).

There is no genuine dispute as to the material fact that Laurel experienced material functional defects with the Pwnie service and sensors, which constituted a material breach of the Pwnie Agreement, and Pwnie failed to cure the breach.  Accordingly, Laurel had cause to terminate the Pwnie Agreement and was relieved of its obligation to pay for the third year of the subscription.

---

[3] Although the Terms and Conditions are unenforceable as set forth in Section III.B.ii *infra* of this memorandum, Laurel complied with the termination provision in Section 2.2 of the Terms and Conditions.

Section 1 of the Terms and Conditions, entitled "Scope of Agreement," provided that the Pwnie software "shall allow a Licensee to identify, report, assess and respond to cyber threats to its wired and wireless networks using Sensors deployed at Licensee's locations." Ex. D. Over the approximately one year Laurel used the Pwnie service, it experienced material functional defects, including: (a) when Pwnie initially sent the sensors to Laurel in 2017, numerous sensors were misconfigured and Laurel had to send approximately 10 to 20 sensors back to Pwnie to be reconfigured; (b) the sensors were dropping off the network; (c) the sensors were unresponsive; (d) the system was overburdened and unstable due to the processes overloading the system; (e) Pwnie marketed the service as a vulnerability scanning tool, the service had limited vulnerability scanning capabilities and the vulnerability scanning was making the system crash; (f) the data provided by the sensors was inconsistent and incorrect; (f) the sensors delivered false positive alerts; and (g) the software connection would fail and kick the user out of the dashboard so it could not access and monitor the data. Ries Affidavit, ¶¶ 10–16; Ex. L, Ries Dep., 60:17–66:8; Ex. K, Foster Dep., 69:23–71:2. The software did not allow Laurel to identify, report, assess and respond to cyber threats, as promised under the Terms and Conditions. Ries Affidavit, ¶ 17.

This provision demonstrates, as evidenced by the title, the "scope" or purpose of the Pwnie Agreement. The material functional defects that prevented Laurel from identifying, reporting, assessing and responding to cyber threats, which was the purpose of the contract, justified Laurel walking away from the contract and no longer being bound by it. *See G4S Tech. LLC*, 479 Mass. at 733–34.

Laurel made Pwnie aware of these defects through support calls and emails during the time it used the software. Ries Affidavit, ¶ 16; Ex. L, Ries Dep., 59:22–66:8; Ex. I. Although Pwnie attempted to cure the defects at first, its attempts were unsuccessful. Ries Affidavit, ¶ 17; s*ee* Ex.

L, Ries Dep., 59:22–66:8; Ex. K, Foster Dep., 68:20–69:4, 69:17–22.  The issues were consistent

and recurring to the point that Laurel ceased using the service in late 2018.   Ries Affidavit, ¶ 18.

On July 9, 2019, approximately seven months after Laurel stopped using the Pwnie

software, Laurel again, by email from Foster to Lee, informed Pwnie of the defects in the Pwnie

software.  Ex. E.  Although Lee initially informed Foster that he would bring up Foster's concerns

at the next "exec staff meeting," Pwnie failed to respond to Laurel's concerns and failed to cure

the defects.  Ex. K, Foster Dep., 65:5–10, 96:5–13.  Thus, Pwnie failed to cure its material breach

and Laurel exercised its right to terminate the Pwnie Agreement for cause.  *See* Ex. D.  As such,

Laurel is not obligated to pay the subscription fee for the third year.  Laurel is, thus, entitled to

summary judgment on Count I as it relates to payment of the subscription fee.

### ii.     Laurel Did Not Breach The Pwnie Agreement When It Did Not Return All Of The Sensors Because The Terms And Conditions Are Unenforceable.

The Pwnie Agreement states in part:

> The end user customer or Licensee's use or license of the Software, Sensors and Support Services set forth herein is governed by the terms and conditions of this Order Form and the *then current Pwnie Express SaaS Terms and Conditions at https://www.pwnieexpress.com/saas-terms-and-conditions/      which      are incorporated herein by reference*.

Ex. A (emphasis added).  The hyperlink purported to be to the Terms and Conditions was buried

in a paragraph at the bottom of the second page of the Pwnie Agreement and was not conspicuous

such that the Terms and Conditions were reasonably communicated to and accepted by Laurel.

*See* Ex. A.  As such, the Terms and Conditions are unenforceable.

"Incorporation by reference is a common tool in the drafting of contracts."  *Artuso v. Vertex*

*Pharms., Inc*., 637 F.3d 1, 7 (1st Cir. 2011).  "[T]he document to be incorporated [must] be referred

to and described in the contract so that the referenced document may be *identified beyond doubt* . . .

11

[and] it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms . . . ." *BBJ, Inc. v. MillerCoors, LLC*, 2015 U.S. Dist. LEXIS 94705, at *16 (D. Mass. Jul. 21, 2015) (emphasis added) (*quoting* 11 R. Lord, Williston on Contracts § 30.25 (4th ed. 2015)).  In *BBJ, Inc.*, the court held that the defendants failed to establish that a purchase order's reference to "[t]he Company's Standard Terms and Conditions" incorporated the document entitled "Purchase Order Terms and Conditions" because "[n]ot only [was] there a discrepancy in the titles of the documents, but there [was] no other identifying information—such as dates or document numbers—to alleviate the ambiguity." *Id.* (*citing Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1346–47 (Fed. Cir. 2008).

"When the terms of an agreement are only available by following a link, the court must consider 'the language that was used to notify users that the terms of their arrangement . . . could be found by following the link, how prominently displayed the link was, and any other information that would bear on the reasonableness of communicating [the terms]." *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 62 (1st Cir. 2018); *see also Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017).  In considering the enforceability of the forum selection clause in a web-based contract,[4] the court should address (1) "whether the contract terms were reasonably communicated to the plaintiffs," and (2) "whether the record show[ed] that those terms were accepted and, if so, the manner of acceptance." *Cullinane*, 893 F.3d at 62 (*citing Ajeman v. Yahoo!, Inc.*, 83 Mass. App. Ct. 565 (Mass. App. Ct. 2013)).  The party seeking to enforce the contract has the burden to show that the terms were reasonably communicated and accepted. *Id.*

In determining whether the provision was "reasonably communicated" to the plaintiffs, the court in *Cullinane* looked to whether the provision was "conspicuous," meaning that it is "so

---

[4] The Pwnie Agreement was delivered to Laurel by email and was viewed and signed as a PDF.  Foster Affidavit, ¶ 9.

written, displayed or presented that a reasonable person against which it is to operate ought to have noticed it." *Id.* at 16 (*citing* Mass. Gen. Laws ch. 106, § 1-201(b)(10)).  A term may be conspicuous if it is in larger and contrasting font or somehow set off from the surrounding text.  *Id.*  When terms are available only by a hyperlink, the court must review the language used to notify the person that the terms could be found by following the link, how prominently displayed the link was, and any other information bearing on the reasonableness of communicating the terms.  *Id.* at 16–17 (*quoting Ajemian*, 987 N.E.2d at 612).

The District Court has found that a hyperlink in a web-based contract was reasonably communicated when (i) it was blue and underlined, (ii) the plaintiff was required to view the full text of the provisions found at the hyperlink before he could proceed to the subsequent steps, and (iii) the plaintiff was required to acknowledge assent to the provisions by electronically signing an acknowledgment.  *Garg v. VHS Acquisition Subsidiary No. 7*, 2021 No. 4:20-cv-40060-TSH, 2021 U.S. Dist. LEXIS 65104, at *18 (D. Mass. Mar. 9, 2021).  *See Emmanuel v. Handy Techs., Inc.*, 442 F. Supp. 3d 385, 393 (D. Mass. 2020) (finding reasonable communication where plaintiff was required to check a box indicating her acknowledgement of, and agreement with, the hyperlinked terms of use before being able to proceed to subsequent screens); *see also Infinity Fluids, Corp. v. General Dynamics Land Sys.,* 2013 U.S. Dist. LEXIS 86042, at *12–13 (D. Mass. June 19, 2013), (court found provision available through hyperlink valid because separate and conspicuous text box *on every page* of purchase order "clearly and unequivocally state[d]" that the provision could be found at hyperlink).

In the present case, the Terms and Conditions are unenforceable because there is no genuine dispute with respect to the material facts that (a) the Terms and Conditions were not

referred to and described in the Pwnie Agreement so that the referenced document could be identified beyond doubt and (b) Laurel did not have knowledge of or assent to the terms.

First, the Terms and Conditions were not referred to and described in the Pwnie Agreement so that the referenced document could be identified beyond doubt.  The Pwnie Agreement refers to the Terms and Conditions as "the then current Pwnie Express SaaS Terms and Conditions."  Ex. A.  The Terms and Conditions which Plaintiff claims is the document incorporated in the Pwnie Agreement is titled "Pwnie Express Terms and Conditions and End User License Agreement Pwn Pulse Software and Sensor Hardware as a Service."  Ex. D.  Additionally, the bottom of the Terms and Conditions states "Pwnie Express Terms & Conditions and End User License Agreement – SAAS (Rev. 11 January 17).  *Id.*  The documents are referred to by three different titles and there is no information to identify the referenced document *beyond doubt*.  Ex. A; Ex. D.  There is no way to determine whether the document Plaintiff claims was incorporated by reference in the Pwnie Agreement was in fact the document that could be found at the hyperlink on the Pwnie Agreement at the time it was entered into.

Second, Laurel did not have knowledge of or assent to the Terms and Conditions.  The hyperlink was buried in a paragraph at the end of the Pwnie Agreement in the same size font as the rest of the document.  Ex. A.  Additionally, Laurel was not required to view the full text of the Terms and Conditions before it could proceed with signing the Pwnie Agreement, the text containing the hyperlink did not specify what was included in the Terms and Conditions, and Laurel was not required to acknowledge assent to the Terms and Conditions by signing the document.  Ex. A.  Accordingly, the Terms and Conditions are unenforceable.

Because the Terms and Conditions are unenforceable, Laurel owns the sensors and is, therefore, not obligated to return them to Plaintiff.  Nothing in the Pwnie Agreement states who

owns the sensors or obligates Laurel to return them.  Ex. A. Section 2.4 of the Terms and Conditions provides:

> All equipment supplied by Pwnie Express for use pursuant to this Agreement shall be owned by Pwnie Express. Upon termination of this Agreement . . . the Licensee, at the Licensee's cost, agrees to return, within thirty (30) days of the termination of this Agreement, all equipment to Pwnie Express.  Failure to return such equipment will result in a charge to the licensee for the price of such equipment.

Ex. D.  Because the Terms and Conditions are not enforceable, Laurel was not obligated to return the sensors.  In fact, Pwnie represented to Laurel that Laurel owned the sensors.  Ex. K, Foster Dep. 52:3–6; Foster Affidavit, ¶ 7.  This fact is consistent with the agreement Pwnie has with Laurel's sister company, Ciena Healthcare.  Ex. C; Ex. K, Foster Dep., 10:19–11:6.  At all times during the duration of the Pwnie Agreement and after, Laurel was under the impression that it owned the sensors and did not have to return them.  Ex. K, Foster Dep*.*, 52:3–6; Foster Affidavit, ¶ 7. There is no genuine dispute as to the material fact that Laurel owns the sensors and was, thus, not obligated to return them.  Because the Terms and Conditions are unenforceable, Laurel did not breach the Pwnie Agreement when it did not return all of the sensors.  Laurel is, thus, entitled to summary judgment on Count I as it relates to the sensors.

### iii.   Assuming *Arguendo* That Laurel Does Not Own The Sensors, The Value Of The Sensors Has Depreciated Such That They Are Not Worth Any Value.

Laurel received a total of forty-one sensors.  Ex. A.  Plaintiff alleges that Laurel owes Plaintiff for the cost of the unreturned sensors pursuant to Section 2.4 of the Terms and Conditions, which provides that Laurel's failure to return the sensors would result in a charge for the price of the sensors.  Complaint, ¶¶ 34-40; Ex. D.  Plaintiff alleges that the sensors cost $1,500 each. Complaint, ¶ 36.

During Plaintiff's 30(b)(6) deposition, Plaintiff's representative and Chief Financial Officer, Jonas Alfredson ("Alfredson"), was asked whether the sensors had been depreciated. Ex. M, Plaintiff Dep., 57:6–8. Alfredson responded that Plaintiff depreciates all of its assets according to U.S. GAAP or Swedish GAAP and that he assumes the depreciation rate for the sensors is twenty percent for a five-year depreciation time. *Id.,* 57:9–17. Because the sensors delivered to Laurel in 2017 had a five-year depreciation, 2022 would be the fifth year and, thus, the value of the sensors has fully depreciated. *Id.*, 57:18–21. As such, Plaintiff does not owe Laurel anything for the price of the remaining sensors.

### C.    Laurel Is Entitled To Summary Judgment On Count II Because It Acted In Good Faith.

"Every contract implies good faith and fair dealing between the parties to it." *T.W. Nickerson, Inc. v. Fleet Nat'l Bank*, 456 Mass. 562, 569–70 (2010) (internal quotation marks omitted). "The covenant of good faith and fair dealing requires that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* at 704 (citation and internal quotation marks omitted). "The purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004). "The essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations . . . ." *Speakman v. Allmerica Fin. Life Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005).

Plaintiff alleges in the Complaint that Laurel's actions with regard to its breach of the Pwnie Agreement and misrepresentations constitute bad faith. Complaint, ¶ 44. There is no genuine dispute as to the material facts that (a) Laurel did not act in bad faith by not paying the third year of the subscription because it notified Pwnie of its intent to terminate the Pwnie

Agreement and Pwnie never responded to Laurel's termination email; Foster Affidavit, ¶¶ 10–12; and (b) Laurel did not make any misrepresentations to Plaintiff about paying the invoice.  Ex. K, Foster Dep., 80:7–24.

Laurel did not breach the implied duty of good faith and fair dealing by not paying for the third year of the subscription because it properly terminated the Pwnie Agreement for cause in conformance with its reasonable understanding of its obligations under the agreement.  The Pwnie Agreement allowed for Laurel to terminate for a material breach and failure to cure such breach. Ex. D.  Pwnie materially breached the Pwnie Agreement when the PPPE service and associated sensors failed to perform and were functionally defective.  Ries Affidavit, ¶¶8–15.  Laurel continuously notified Pwnie of the defects, including on July 9, 2019, when Foster emailed Lee informing him of Laurel's intent to terminate the Pwnie Agreement.  Ries Affidavit, ¶ 16; Ex. E. Foster's intention when he sent Lee the July 9, 2019 email was to terminate the Pwnie Agreement prior to the third renewal anniversary of the subscription due to Pwnie's material breach, which Pwnie failed to cure.  Foster Affidavit, ¶ 10; Ex. K, Foster Dep., 68:9–19.  As such, Laurel understood the termination to be effective.  *Id.*

Additionally, Foster's statement to Plaintiff on April 28, 2020, that he submitted the invoice for the third year of the subscription for payment, was not a misrepresentation.  On April 28, 2020, Alfredson emailed Foster stating: "You have an outstanding unpaid invoice for the year 3 of your 3-year contract of the Pulse Platform.  Our Order Manager has tried to reach out to you several time with no success.  The invoice amounts to USD 90,191.80 was due 27th of October 2019." Ex. K.  Foster replied: "I have submitted this invoice for payment.  You should receive payment in a few weeks.  Thanks."  *Id.*  Alfredson then asked Foster for proof of payment, to which Foster replied:

> The check cannot not be cut this week so there can be no proof of payment this week.  You can add any late fee you want but I guarantee you it will not be paid.  You are fortunate that you soon will be getting all of the $90,191.80.  You have done nothing to earn it except to buy Pwnie Express and their poor product.  You are aware, I hope, that we have not used the product for more than a year, that it never really worked well and that it adds no value to our operations.

*Id.*

Although Laurel did not and does not owe Plaintiff the subscription fee because the Pwnie Agreement was terminated, Foster did in fact submit the invoice for payment on April 28, 2020, prior to emailing Alfredson, and intended to pay Plaintiff the purportedly owed $90,191.80.  Ex. K, Foster Dep., 80:7–24.  After Foster submitted the invoice for payment to Laurel's accounts payable, Foster spoke with his boss, Laurel's Chief Financial Officer, and informed him of the situation with Plaintiff.  *Id.,* 81:17–20.  Foster's boss told Foster "to stop the payment and not have it processed."  *Id.*, 81:20–21.  Following his boss's instructions, Foster stopped the payment to Plaintiff.  *Id.,* 81:13–15.  Foster did not make any misrepresentations to Laurel as to the payment.  Accordingly, there is no evidence that could support a finding that Laurel breached the covenant of good faith and fair dealing.  Laurel is, therefore, entitled to summary judgment on Count II.

### D.      Laurel Is Entitled To Summary Judgment On Count III Because It Did Not Make Any Misrepresentations Of Fact To Plaintiff.

To succeed on its claim for deceit, Plaintiff must establish that (1) Laurel made a false representation of a material fact with knowledge of its falsity, (2) for the purpose of inducing Plaintiff to act, (3) Plaintiff relied upon the representation as true, and (4) Plaintiff acted upon it to its detriment.  *Masingill v. EMC Corp.*, 449 Mass. 532, 540 (2007).

Laurel is entitled to summary judgment on Count III because there is no genuine dispute as to the material fact that Laurel did not make any false representation of material fact with knowledge of its falsity.  As detailed in the previous section, Laurel did not misrepresent that it

terminated the Pwnie Agreement as it did in fact effectively terminate the Pwnie Agreement due to Pwnie's material breach and failure to cure such breach.  Foster Affidavit, ¶ 10; Ex. K, Foster Dep., 68:9–19.  Additionally, Foster did not misrepresent that payment was forthcoming because he did submit the invoice for payment on April 28, 2020, and intended to pay Plaintiff even though the Pwnie Agreement had been terminated.  Ex. K, Foster Dep., 80:7–24.  Laurel is, therefore, entitled to summary judgment on Count III.

### E.      Laurel Is Entitled To Summary Judgment On Count IV Because It Did Not Engage In Any Unfair Business Practices.

Pursuant to M.G.L., c. 93A, § 2, "unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful."   The statute provides a cause of action to "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property . . . as a result of the use or employment by another person who engages in any trade or commerce of . . . an unfair or deceptive act or practice declared unlawful by section two . . . ."  *Id.* § 11.  To succeed on its claim under M.G.L., c. 93A § 11, Plaintiff must prove: (1) Laurel committed an unfair or deceptive act or practice; (2) it suffered a loss of money or property; and (3) Laurel's unfair or deceptive method, act or practice caused the loss suffered.  *Anoush Cab, Inc. v. Uber Techs., Inc.*, 8 F.4th 1, 16 (1st Cir. 2021) (*citing Auto Flat Car Crushers, Inc. v. Hanover Ins. Co.*, 469 Mass. 813, 820 (Mass. 2014)).  "Chapter 93A does not define what constitutes an 'unfair or deceptive practice.'"  *Anoush Cab, Inc.*, 8 F.4th 1, 17.  The First Circuit has "followed the Massachusetts courts' lead in using the term 'egregious' to state the standard of Chapter 93A liability."  *Id.* at 18.  "Something more" than "mere negligence" is required for a successful Chapter 93A claim.  *Id.*

In *Pride Assocs. v. Fabricating & Prod. Mach.*, 2002 Mass. Super. LEXIS 123, at *10 (Worcester Cty. Sup. Ct. Mar. 19, 2002), the plaintiff claimed the defendant breached the contract

by failing to pay the amount due.  The defendant, however, contended that it was excused from paying due to a significant breach of the contract by the plaintiff.  *Id.*  The court entered judgment in favor of the defendant finding that the plaintiff did not meet its burden of proving that the defendant acted unfairly or deceptively.  *Id.* at \*19.  The court found that "the evidence show[ed] that the defendant was not motivated by some 'pernicious purpose' and that it considered itself reasonably justified in withholding payment . . . from [the plaintiff] for its damages that it perceived caused by [the plaintiff].  This is not the stuff from which violation of c. 93A is made."  *Id.* at \*20.

Assuming *arguendo*, this Court finds that Laurel did breach the Pwnie Agreement by failing to pay the subscription fee, Laurel's conduct was not so egregious as to constitute a violation of Chapter 93A.  Laurel considers itself reasonably justified in not paying the subscription fee because it believed it effectively terminated the Pwnie Agreement on July 9, 2019, three months before the start of the third year.  Ex. K, Foster Dep., 65:3–15; Ex. A; Ex. D.

As to Foster's representation that Laurel was going to pay the subscription fee, such conduct cannot constitute a violation of Chapter 93A because as previously explained, there is no genuine dispute at to the material fact that it was not a misrepresentation because Foster submitted the invoice for payment and intended to pay it.  Ex. K, Foster Dep., 80:7–24.  This does not meet the level of egregiousness required for a Chapter 93A violation.  *See e.g., Pride Assocs.*, 2002 Mass. Super. LEXIS 123, at \*10.  Laurel is, therefore, entitled to summary judgment on Count VI.

## IV.   CONCLUSION

For the foregoing reasons, the Court should grant Laurel's Motion for Summary Judgment and dismiss the four-count Complaint in its entirety.

Dated:  New Haven, Connecticut
        March 7, 2023

**LAUREL HEALTH CARE COMPANY**

By:  /s/ Glenn A. Duhl

Glenn A. Duhl BBO# 653001
Adam J. Lyke BBO# 684881
Zangari Cohn Cuthbertson
    Duhl & Grello P.C.
59 Elm Street, Suite 400
New Haven, CT 06510
GAD: (203) 786-3709
AJL:   (203) 786-3706
Fax:    (203) 782-2766
gduhl@zcclawfirm.com
alyke@zcclawfirm.com