UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| OUTPOST24 AB, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 21-cv-10449-ADB |
| LAUREL HEALTH CARE COMPANY, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff Outpost24 AB ("Outpost") asserts claims for breach of contract, breach of the covenant of good faith and fair dealing, deceit, and unfair business practices against Defendant Laurel Health Care Company ("Laurel") relating to the breakdown of a business relationship in which Laurel purchased cybersecurity services. [ECF No. 1 at 6–9; ECF No. 45 at 2]. Pending before the Court is Laurel's motion for summary judgment on all claims. [ECF No. 44]. For the reasons set forth below, the motion is DENIED.

I.     **BACKGROUND**

Except as otherwise noted, the following facts are not in dispute.[1]

---

[1] Local Rule 56.1 provides that "[m]otions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried," and that "[a] party opposing the motion shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried." L.R. 56.1. "Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties." Id. Accordingly, facts set forth by Laurel, [ECF No. 45], that are not specifically controverted by Outpost's opposition statement, [ECF No. 48], are deemed admitted for purposes of this motion.

A.        The Pwnie Agreement

"On June 15, 2017, Laurel entered into an agreement with Rapid Focus Security, Inc.

d/b/a Pwnie Express ('Pwnie') for the Pulse Platform Professional Edition ('PPPE'), a cyber

security software service" (the "Pwnie Agreement" or "Agreement").[2]  [ECF No. 45 at 2

("Mot.")].  As explained below, the claims in this case generally arise from a dispute over

whether Laurel terminated the Agreement in July 2019.  See infra.

Several provisions of the Pwnie Agreement are relevant to whether Laurel effectively

terminated it.  First, the license term was "thirty-six (36) months from the last shipment date,"

[ECF No. 45-4 at 2], which was September 30, 2017, [id. at 3]; see also [Mot. at 2].  An annual

subscription fee of $90,191.80 was "payable annually, in advance, upon the Effective Date of"

the Pwnie Agreement, [ECF No. 45-4 at 2], "and on each Renewal Anniversary thereafter," the

first of which was October 7, 2018, [id. at 3]; see also [Mot. at 2].

Second, the two-page Pwnie Agreement states that

> [t]he end user customer or Licensee's use or license of the Software, Sensors and
> Support Services set forth herein is governed by the terms and conditions of this
> Order Form and the then current Pwnie Express SaaS Terms and Conditions at
> https://www.pwnieexpress.com/saas-terms-and-conditions/ which are incorporated
> herein by reference.  The person signing this Order Form represents that she/he is
> authorized to bind the end user customer or Licensee identified above and that end
> user customer or Licensee accepts all of the terms and conditions of this Order
> Form, including such then-current Pwnie Express SaaS Terms and Conditions.

[ECF No. 45-4 at 3]; see also [Mot. at 2].  The hyperlink in the Agreement is blue and

underlined.  [Id.]; see also [Mot. at 2].  Laurel argues that "[a]t no point prior to signing the

Pwnie Agreement did Laurel see or review the Terms and Conditions, nor did Pwnie ever send

Laurel the Terms and Conditions separate from the hyperlink in the Pwnie Agreement."  [Mot. at

---

[2] In August 2019, Outpost "acquired certain assets of Pwnie[,] including the Pwnie Agreement."
[Mot. at 3]; see also [ECF No. 48 at 1 ("Opp.")].

2

2].  Outpost, on the other hand, says, among other things, that the hyperlink was "conspicuous" in the contract and that testimony about whether a Laurel representative "read the terms and conditions, knew of them, and or agreed to them" is "not consistent."  [Opp. at 4–5].

In any event, Section 2.1 of the Terms and Conditions provides that "[t]he term of the license for the use of the Software and Sensors will commence seven (7) days after the first shipment of the Order . . . and continue for the license term . . . unless terminated as provided herein . . . ."  [ECF No. 45-7 at 2].  The termination provision, Section 2.2, provides that

> Licensee shall have no right to terminate the Agreement without cause.
>
> Either party may terminate this Agreement upon thirty (30) days prior written notice in the event of a material breach by the other party of any term and condition of this Agreement and a failure to cure such breach.
>
> In the event of any such expiration or termination of the Agreement, no refund of fees shall be due and owing to Licensee, and Licensee shall pay any fees then due and owing for the remainder of the applicable license term.  Licensee shall cease all use of the Software and Sensors upon the expiration or termination of this Agreement.  Any expiration or termination of this Agreement shall not modify any rights or obligations of a party hereto which arose prior to such expiration or termination.

[Id. at 2–3].

Finally, the Agreement provided that Laurel would receive "forty-one (41) . . . sensors," [ECF No. 45-4 at 2]; see also [Mot. at 2], which were "placed in each of Laurel's facilities, and were supposed to scan Laurel's wireless network for security threats," [id. at 2].

The parties dispute whether Laurel or Outpost owned the sensors.  See [Mot. at 2; Opp. at 4–5].  Laurel claims that "Pwnie represented to Laurel that Laurel owned the sensors," [Mot. at 2], whereas Section 2.4 of the Terms and Conditions of the Pwnie Agreement provides that

> [a]ll equipment supplied by Pwnie Express for use pursuant to this Agreement shall be owned by Pwnie Express.  Upon termination of this Agreement, unless Pwnie Express elects to disable or abandon all or any of the equipment owned by it, the Licensee, at the Licensee's cost, agrees to return, within thirty (30) days of the termination of this Agreement, all equipment to Pwnie Express.  Failure to return

such equipment will result in a charge to the Licensee for the price of such equipment[,]

[ECF No. 45-7 at 3]; see also [Opp. at 2].

**B.    The Disputed Termination of the Pwnie Agreement**

Laurel paid the annual subscription fee for the first two years that the Pwnie Agreement was in effect.  [Opp. at 2].  Then, on July 9, 2019, Kelly Foster of Laurel emailed Kurt Lee of Pwnie stating, among other things, that

> [w]hile we have the devices installed and do monitor the data, we find it of little use, not very accurate, buggy, the devices temperamental and certainly not worth $100K per year. . . .
>
> Besides problems with the devices, which should have been documented in support calls, we simply do not need the Pwnie services, and never really did.  We get the same information, and much more, and more accurately, with our other systems. Not a knock on Pwnie – it just doesn't give us much that we need.
>
> Obviously, we will not be renewing our contract (September?).  So, if any type of notice is required, please consider this it and do not bill us.  Is there anything else Laurel needs to do to wind-down the contract?

[ECF No. 45-8 at 2].  The parties dispute whether this email exchange showed an intent to terminate and/or sufficed to actually terminate the Agreement.  [Mot. at 3; Opp. at 2, 5].

Approximately one month later, in August 2019, Outpost acquired the Agreement.  [Mot. at 3].  Four months after that, on December 4, 2019, Ellinor Klingvall of Outpost emailed Nicholas Ries of Laurel stating that she was "[g]oing through our accounts receivables list [and] I noticed that [Laurel's] invoice, year 3/3 for the Pulse Platform subscription purchased from Pwnie Express is still unpaid.  Do you have any update on when we will receive the payment?" [ECF No. 45-9 at 2]; see also [Mot. at 3].  The parties dispute whether this was the first time that Laurel received an invoice for the third year of the alleged contract term.  [Mot. at 4; Opp. at 3].

Nearly five months later, in April 2020, Jonas Alfredson of Outpost emailed Foster of Laurel stating that Laurel had

4

an outstanding unpaid invoice for the year 3 of your 3-year contract of the Pulse Platform. Our Order Manager has tried to reach out to you several time with no success.  The invoice amounts to USD 90,191.80 was due 27th of October 2019.  If no payment are received (or proof of payment) before 30th of April we will take legal actions including penalty fees.

[ECF No. 45-13 at 5].  Foster responded that "I have submitted this invoice for payment. You should receive payment in a few weeks," to which Alfredson stated "OK but I need proof of payment this week otherwise we will charge late payment penalty fees.  The invoice was overdue October 27, 2019."  [Id. at 4].  In response, Foster said that

> [t]he check cannot not be cut this week so there can be no proof of payment this week. You can add any late fee you want but I guarantee you it will not be paid. You are fortunate that you soon will be getting all of the $90,191.80. You have done nothing to earn it except to buy Pwnie Express and their poor product. You are aware, I hope, that we have not used the product for more than a year, that it never really worked well and that it adds no value to our operations.

[Id. (emphasis omitted)].

Regarding the sensors, although Laurel expressed that it had issues with them and stated that they were not renewing the contract, see, e.g., [Mot. at 4; ECF No. 45-8 at 2], the parties dispute the extent of the defects, [Mot. at 4–5; Opp. at 6].  Further, Laurel retained at least some sensors, [Opp. at 3; ECF No. 51 at 6–7], and it is disputed whether it continued to use them into 2020, [Mot. at 4–5; Opp. at 3].

Ultimately, Laurel did not pay the subscription fee for the third year, [ECF No. 45 at 4], and this lawsuit followed.

### C.    Procedural History

Outpost filed its complaint on March 16, 2021.  [ECF No. 1].  Following discovery, on March 7, 2023, Laurel moved for summary judgment on all claims.  [ECF No. 44].  Outpost opposed on April 12, 2023, [ECF No. 48], and Laurel filed a reply on May 4, 2024, [ECF No. 51].

## II.      STANDARD OF REVIEW

Summary judgment is appropriate where the movant demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is material if its resolution might affect the outcome of the case under the controlling law." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003). "A genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." Id.  When reviewing the record, the court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Id.  The First Circuit has noted that this standard "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).  "The factual conflicts upon which he relies must be both genuine and material," Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the court may discount "conclusory allegations, improbable inferences, and unsupported speculation," Cochran, 328 F.3d at 6 (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

"To succeed in showing that there is no genuine dispute of material fact," the moving party must point to "specific evidence in the record that would be admissible at trial." Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015).  "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Id. at 4–5 (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." Celotex Corp. v. Catrett, 477 U.S.

317, 323–24 (1986).  Once the movant takes the position that the record fails to make out any

trial-worthy question of material fact, "it is the burden of the nonmoving party to proffer facts

sufficient to rebut the movant's assertions."  Nansamba v. N. Shore Med. Ctr., Inc., 727 F.3d 33,

40 (1st Cir. 2013).

III.     **DISCUSSION**

As explained above, Outpost brings four claims against Laurel: (1) breach of contract, (2)

breach of the covenant of good faith and fair dealing, (3) deceit, and (4) unfair business

practices.  [ECF No. 1 at 6–9].  All of these claims depend on facts that, viewing the evidence in

the light most favorable to Outpost, see Cochran, 328 F.3d at 6, are in dispute.

First, for example, the breach of contract claim is predicated on the fact that either Laurel

terminated the contract, and/or Outpost committed a material breach of the contract by failing to

cure alleged defects with the sensors.  [Mot. at 6–11].  As explained above, at least the following

relevant and material facts are in dispute: whether (1) Laurel was and/or should have been aware

of the terms and conditions in the Pwnie Agreement, [id. at 2; Opp. at 4–5]; (2) the July 9, 2019

email was a termination of the Agreement, [Mot. at 3; Opp. at 2, 5]; and (3) the sensors were

materially defective and/or should have been and were in fact returned, [Mot. at 4–5; Opp. at 3,

6].

Second, Laurel's argument that it did not breach the covenant of good faith and fair

dealing depends on whether it acted in bad faith by not paying the third installment of the

contract in light of its termination email, [Mot. at 16–17], which in turn depends on whether it

terminated the Pwnie Agreement for cause and thus reasonably refused to pay, which is also

disputed, [id. at 17–18]; see also [id. at 2–5; Opp. at 2–5].

Third, Laurel avers, among other things, that it did not deceive Outpost because it "did not misrepresent that it terminated the Pwnie Agreement and it did in fact effectively terminate the Pwnie Agreement due to Pwnie's material breach and failure to cure such breach." [Mot. at 18–19]. Again, these material facts are in dispute. See [id. at 3; Opp. at 2, 5].

Finally, Laurel argues that it did not engage in unfair business practices under Mass. Gen. Laws Ch. 93A, § 2 where it "considere[d] itself reasonably justified in not paying the subscription fee because it believed it effective[ly] terminated the Pwnie Agreement," and because Laurel's representation that it would submit the invoice for payment was not a misrepresentation as it was in fact submitted for payment. [Mot. at 19–20; ECF No. 45-13]. Outpost argues in response that "[t]he retention and use of the sensors, after an alleged termination and promise to pay," was unfair and deceptive. [Opp. at 10]. Material facts that bear on both arguments are in dispute. See, e.g., [Mot. at 3–5; Opp. at 2–5; ECF No. 45-13].

Accordingly, there are disputes of material fact that prevent the Court from finding that Laurel is entitled to judgment as a matter of law, see Fed. R. Civ. P. 56(a), and thus the Court declines to grant summary judgement.

## IV.    CONCLUSION

Accordingly, Laurel's motion for summary judgment, [ECF No. 44], is DENIED.

**SO ORDERED.**

January 24, 2024                                    /s/ Allison D. Burroughs
                                                    ALLISON D. BURROUGHS
                                                    U.S. DISTRICT JUDGE